

**SIGNED this 30th day of September, 2022**

_Shelley D. Rucker_
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

In re:

**River City Resort, Inc.,**

      **Debtor.**

**No. 1:14-bk-10745-SDR**

**Chapter 7**

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

      The firm of Farinash & Stofan has filed a second application for interim compensation as counsel to the Chapter 7 Trustee, under 11 U.S.C. § 331 and Bankruptcy Rule 2016. (Application, Doc. No. 520).[1]  The application seeks the allowance of fees in the amount of $71,313.75 as compensation for services rendered by Jerrold D. Farinash, Amanda Stofan, and Rebecca Farinash during the period of February 13, 2018, to May 4, 2022.  The firm also seeks the allowance of the $2,032.96 in expenses for that same period.

---

[1] All references to docket entry numbers are to the main case, No. 1:14-bk-10745-SDR, unless otherwise noted.

Creditor James L. Henry has objected to the application (Objection, Doc. No. 522) on the following bases:

1.  A significant portion of the fees requested by the Applicant were not reasonable and necessary and were not reasonably likely to benefit the estate, nor were they necessary for the administration of the debtor's estate.  11 U.S.C. §330 (a)(1) and (4)(A).

2.  Until Henry's lien issue is finally resolved in 18-ap-01044-SDR,[2] Applicant cannot be paid any fees over the $300,000 carve-out that he was awarded in the sale of the debtor's property.  All other funds in the estate might still be subject to Henry's lien.  The Court should delay any ruling on Applicant's fees until it sees how Applicant has benefitted the estate, because Applicant seeks to be awarded fees far in excess of the $300,000 administrative carve-out previously allowed for the payment of administrative expenses.  (Doc. No. 425 ¶ 8.)

(Objection, Doc. No. 522 at 1).  Specifically, he contends that the Trustee never should have involved himself in the action filed by Mr. Henry in the Chancery Court against Emma Casey and others, referred to herein as the "1029 Proceeding."

The Court has jurisdiction to hear and determine this contested matter under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(A).  The Court held a hearing on the application on June 23, 2022.  Counsel for Mr. Henry appeared in opposition to Mr. Farinash's application.  No other creditor objected, including the U.S. Trustee.

Based on the analysis below, and except for $3,765.00 of the fees, the Court finds that the services were reasonable and necessary for the estate and will allow the fees in the amounts requested.  With respect to their payment, the Court finds that no stay is in effect that would prevent their payment.  However, these are interim fees, and the Court is concerned about what additional fees will be incurred prior to completion and the possibility of the need for

---

[2] This adversary proceeding is referred to as the "1044 Proceeding."

disgorgement.  Therefore, the Court will allow only 80% of the allowed fees to be paid at this

time.  The remaining 20% of fees will be held back subject to approval of a final fee application.

## II.    FINDINGS OF FACT

### A.    Initial Filing Under Chapter 11

The debtor filed on February 24, 2014, as a Chapter 11 debtor in possession.  Problems

arose during the first year of the case with the management of the estate's assets and the U.S.

Trustee sought a trustee for the case. Pursuant to an agreed order between the U.S. Trustee and

the parties who objected to the appointment of a trustee, the Court authorized the appointment of

a Chapter 11 trustee.  (Doc. No. 184.)  The Trustee was appointed as the Chapter 11 Trustee on

February 25, 2015.  (Doc. No. 188.)  The Trustee applied to employ his firm Farinash and

Stofan, formerly Farinash and Hayduk, to assist him with the case (Doc. No. 189); the Court

granted the application on March 30, 2015.  (Doc. No. 228.)[3]  That same day, the Court also

authorized the employment of Roger W. Fitch as accountant for the Chapter 11 case.  (Doc. Nos.

203 (application), 229 (order)).

On April 1, 2015, the Court authorized the Trustee to obtain a post-petition loan

for $350,000 secured by real property owned by the debtor and Cornerstone. The proceeds were

to be used to remove a decrepit barge that had a two-story restaurant on it and that was docked at

real property owned by the debtor and its subsidiary.  The Trustee originally obtained post-

petition financing in the amount of $350,000 to relocate the barge (Doc. Nos. 217, 244), but the

barge sank. Then $322,000 of that $350,000 was used to raise the barge. The Court shortly

thereafter authorized the Trustee to sell the barge to a salvage company.  (Doc. No. 244 (Order

Approving Post-Petition Loan); Doc. No. 245 (Order Authorizing Sale)).  The Trustee explained

---

[3] There appears to be a typographical error in the order.  The style of the case reflects that the case is a Chapter 7 although at the time the order was entered, the case remained a Chapter 11.

in his application for interim expenses for the chapter 11 how his efforts to re-float and to remove the barge required constant contact with public officials and travel to Mississippi to interview a contractor for removal services. He eventually succeeded, but only after a significant investment of time and energy:

> This Application is a minuscule encapsulation of the work I performed to remove the barge. The barge was removed 63 days after I was appointed. It is [] my belief that Gulf Steam was the only entity that could have removed the barge and complied with myriad of requirements of the Corps of Engineers and the United States Coast Guard. Many others said they could remove the barge. Some of those wanting to "get a piece of the action" even tried to interfere with my efforts to use Gulf Stream. Finding Gulf Stream was like finding a needle in a hay field.

> I recorded approximately 100 hours of time during the Chapter 11 case. A summary of that time is attached. I believe I recorded approximately 66% of the time I worked to get the barge moved. The overwhelming amount of work, especially after the barge sank, just did not lend itself to putting pen to paper to record time, especially on the weekends. The attached summary of time shows I recorded time on 40 of the 63 days between my appointment and the removal of the barge. To the best of my memory, I did something every one of those 63 days, including weekends.

> It is not my intention to say that the barge was removed as the result of my efforts and my efforts alone. Nothing could be farther from the truth. The efforts of many people combined in a great result for this case and for the community.

(Doc. No. 316 at 6 ¶¶ 18–20.)

**B.    Conversion to Chapter 7**

The case did not last long as a Chapter 11. The Chapter 11 Trustee moved to convert the case to Chapter 7 on May 11, 2015. (Doc. No. 259.) The Court granted the motion on June 12, 2015. (Doc. No. 270.) On June 15, 2015, the Trustee was appointed as the interim Chapter 7 Trustee. (Doc. No. 273.) No other trustee was elected at the first meeting of creditors, and Mr. Farinash became the Trustee. He again sought to employ Roger W. Fitch as the accountant for the Chapter 7 Trustee, to prepare taxes and to perform other accounting work. (Doc. No. 277.) The Court authorized Mr. Fitch's employment on August 4, 2015. (Doc. No. 289.)

The Trustee filed a voluntary Chapter 7 petition for Cornerstone of River City, LLC ("Cornerstone") on January 15, 2016.  (Case No. 1:16-bk-10182-SDR, Doc. No. 1.)  The Trustee was appointed Trustee for that case also.  Cornerstone was a wholly owned subsidiary of the debtor, and approximately a month later, the Court ordered the joint administration of the cases on February 26, 2016.  (Doc. Nos. 306, 307.)  The only asset of Cornerstone was real property located at 424 Manufacturers Road, which has been referred to as Lot 1 in the jointly administered cases.

### C.    Increase in Post-Petition Loan

By 2016, the barge had been removed but no real estate assets had been sold. The Trustee sought an extension and increase in the post-petition loan to provide a source of payment for administrative expenses while the real estate was being marketed.   The Trustee requested and received approval for an additional $100,000 of post-petition financing.  (Doc. No. 319.)

### D.    Chapter 11 Expenses

#### 1.  Chapter 11 Trustee Expenses

The applications for the allowance of Chapter 11 administrative expenses were not made until the spring of 2016, almost 10 months to a year after the conversion.  On March 30, 2016, the Trustee filed an application for Compensation and Reimbursement of Expenses as the Chapter 11 Trustee.  (Doc. No. 316.)  (*Id.* at 6.)  The Trustee sought compensation of $50,000 and reimbursement of $7,505.81 for expenses.  No party objected, and the Court authorized the payment of the compensation and expenses by order entered April 22, 2016.  (Doc. No. 320.)  The docket does not show that any separate application was filed by Farinash and Hayduk for counsel fees attributable to services provided in the Chapter 11.

2. *Accountant for the Chapter 11 Trustee, Roger Fitch*

The first application for Mr. Fitch was filed on June 24, 2016, for the period from March 30, 2015, to June 20, 2016, for $21,062.50 and expenses of $534.10.  (Doc. No. 337.)  The application covers the services provided in the Chapter 11 case from March 5, 2015 (the date his Chapter 11 employment application was filed) to the date of the conversion, and then for services provided in the Chapter 7 case.  The itemized time allows for the services to be allocated to the Chapter 11 and then to the Chapter 7.  Based on the Court's analysis, 13.25 hours were spent from March 5, 2015 to June 8, 2015.  At the rate of $250 an hour, $3,312.50 for fees are attributable to Chapter 11 services.  The remaining $17,750 requested are attributable to Chapter 7 services.[4]  No objections were filed to the application.  The compensation was authorized on July 19, 2016.  (Doc. No. 352.)

3. *Debtor's Attorney*

On September 22, 2017, David Fulton, the debtor's attorney, filed for compensation for his services as counsel in the Chapter 11 case.  (Doc. No. 421.)  The application covered the period from February 18, 2014, to September 22, 2017.  The Court notes that the debtor ceased being a debtor in possession in February 2015.  Mr. Fulton's application included time for another 30 months.  He requested $100,066.50 in fees and $2,848.99 in expenses.  The Trustee and the U.S. Trustee reached an agreement with Mr. Fulton that his fee would be reduced to $88,697 and further reduced by a retainer of $13,697 received prepetition, leaving a Chapter 11 expense claim of $75,000, which has not been paid.  (Doc. No. 423 at 2.)

---

[4] In reviewing the itemization, the entries total 86 hours, but Mr. Fitch only applied for 84.25 hours.  The Court used the time reflected by each entry to calculate the Chapter 7 time.

**E.       Funding for Payment of Expenses—Sale of Manufacturers Road Lots**

When the case commenced, the debtor owned two adjacent lots: 440 Manufacturers Road (Lot 4) and 430 Manufacturers Road (Lot 5).  The joint administration with Cornerstone added a third lot located at 424 Manufacturers Road (Lot 1).  The estate acquired a fourth lot at 416 Manufacturers Road (Lot 3) through a settlement described in more detail below.  (The four tracts are referred to as the "Lots.")  The primary objective of the Trustee, after clearing the barge from the area, was to sell the Lots, which were subject to numerous claims and liens.  In preparation for such a sale, the Trustee sought the consent of various lien or interest holders.

On February 26, 2016, Mr. Henry and the Trustee entered into an agreed order that the Trustee could sell the Lots on which Mr. Henry claimed a lien, with Mr. Henry specifically reserving his right to object to any sale based "upon the amount of the sale or, after consummation of the sale, the right to object to a failure to allocate or improper allocation of the sale proceeds among the Lots described in the Deed of Trust recorded at Book 9554 Pages 195–200 in the Hamilton County Register's Office."  (Doc. No. 308 at 1–2.)  Mr. Henry also preserved his right to object to claims of other creditors and any other action taken by the Trustee in the case including, without limitation, any objection to any settlement with other creditors proposed by the Trustee.  "All valid and perfected liens will attach to the proceeds from any sale of the Property approved by the Court."  (*Id.* at 2.)

An agreed order containing the same consent and preservation of rights was entered with respect to the lien asserted by David Moss ("Moss").  (Doc. No. 309.).

On May 20, 2016, the Trustee requested the entry of an agreed order with Neuhoff Taylor Architects, P.C. to approve an order related to the sale of the Lots.  The order provided that "[a]ll

valid and perfected liens, as later determined by the Court, will attach to the proceeds from any sale [of] the Property approved by the Court."  (Doc. Nos. 330-1 at 1–2, 331 at 1–2.)

The record concerning another lien creditor Xylem Dewatering Solutions, Inc. ("Xylem") and its rights with respect to the sale are unclear.  The Trustee refers in his notice of sale to an order in which Xylem waived its right to object to the sale, but reference in the notice gives the docket number for the Moss agreed order.  (Doc. No. 341 at 17, 19.)  The Court has been unable to find any order or other document in the record that memorializes when or how Xylem waived its right to object to the sale or what rights it retained.  Xylem never filed an objection to the sale of the Lots.  Xylem and Neuhoff's claims have been paid.

Having obtained the consent of several of the lienholders, the Trustee gave creditors notice of his intent to sell the Lots, but he had to file the notice twice.  The Trustee filed the first notice of intent to sell on July 1, 2016.  (Doc. No. 341.)  Among other provisions, the first notice provided that the four Lots would be sold to CW Development Company, LLC for $5,925,000. (*Id.* at 2.)  The Lots would be transferred free and clear of all liens, claims, encumbrances, and interests of any person. "Valid and perfected liens, claims, encumbrances and interest (as later determined by the court) shall attach to the sale proceeds."  (*Id.* at 4 ¶ 28.)  The first notice of a sale made no mention of the payment of administrative expenses.  Following several continuances, the hearing for the first notice was held on February 9, 2017.  (Doc. No. 402.) The motion was denied because the buyer was not willing to proceed.[5]

On February 20, 2017, the Trustee filed the second notice of intent to sell.  (Doc. No. 404.)  The second notice showed the purchaser as KCB Operations, GP, for the same sale price

---

[5] The docket reflects that the first notice was denied, but the Court mistakenly entered an order approving it on March 24, 2017.  (Doc. No. 409.)  This order was vacated on March 27, 2017.  (Doc. No. 413.)

of $5,925,000. (*Id.* at 2.)[6]  The Court approved the second notice on March 27, 2017. (Doc. No. 414.)

The sale to KCB Operations, GP, also fell through, and on October 19, 2017, the Trustee filed a new motion to sell the Lots free and clear of liens. (Doc. No. 425.)  This time, the purchaser was American River Development, LLC.  The purchase price was reduced to $5,200,000.  Although the motion states that the buyer was "[a]s of the date of this Motion . . . not owned or controlled by an insider of the Debtor" (*id.* at 2 ¶ 7), the terms were also changed to allow the buyer to credit bid $3,575,000 as a result of the buyer having taken an assignment of the allowed claim of the Casey Creditors.

Funding for the payment of the Chapter 7 fees was also addressed in the sale motion. (*Id.*)  The purchaser also agreed "to subordinate $300,000 of the credit bid first, to all Chapter 7 administrative fees, in full, then to other purported lien holders (other than James L. Henry, Jr.)." (*Id.* at 3 ¶ 8).  Like the prior two attempts to sell, this motion provided that the property would be transferred free and clear of liens and that "[v]alid and perfected liens, claims, encumbrances, and interests (as later determined by the Court) shall attach to the sale proceeds." (*Id.* at 4 ¶ 15.)  At the hearing, the Trustee announced that he had received another bid for $5,500,000 from Halvorsen Suburban Centers, LLC, and American River Development's bid would serve as a back-up bid.  The Trustee preferred the Halvorsen bid.  The Court granted the motion on November 21, 2017. (Doc. No. 443.)  The closing was to occur on or before February 15, 2018.  The report of sale was filed on February 9, 2018 (Doc. No. 446), and American River Development was ultimately the buyer.  The estate received sale proceeds of $726,284.44 after

---

[6] It reflects that the Court had approved a sale to CW Development but that the sale was never consummated.

paying current real property taxes, closing fees and costs, payoff of post-petition mortgages,

prepetition real property taxes, and parties to the settlement.  (Doc. No. 446.)

### F.    The Prior Settlement with the Lien Holders

Almost 17 months before the sale, on September 26, 2016, the Trustee filed a motion to

compromise various claims and causes of action that he believed the estate had against creditors.

(Doc. No. 374.)  The first settlement was with Lynn Casey; Emma Casey; Heavens No, LLC;

and Trinity Hotel Partners, LLC, who were collectively referred to as the "Casey Creditors" in

the motion and the settlement agreement.  They were family members of Allen Casey, the

debtor's managing member, and interest holders in other companies affiliated with the debtor's

attempts to build the barge resort.  The settlement also proposed to settle with a second group of

creditors: River City Barge and Cafe, LLC; River City Barge Company, LLC; John Winesett;

Barbara Winesett; David Debeter; Roy Roach; and Gregory Hellwig, who had litigated with Mr.

Casey and the debtor for years preceding the filing.  The second group of creditors was referred

to as the "Barge Cafe Creditors."  The third creditor and party to the settlement was David Moss.

He had served as an attorney to the debtor and had filed a deed of trust to secure the payment of

his prepetition legal services.  (Doc. No. 374 at 10, 11.)

In the settlement with the Casey Creditors, who controlled Trinity Hotel Partners, LLC,

the limited liability company conveyed its interest in 416 Manufacturers Road (Lot 3) to the

estate.

The settlement was approved on November 9, 2016 (Doc. No. 393) following a hearing

held on November 3, 2016.  It provided that the liens of the Casey Creditors were avoided in the

approximate amount of $2 million out of $5.599 million claimed.  The avoided amount of the

liens was preserved for the benefit of the estate under Section 551 of the Bankruptcy Code.[7]  The

settlement also reduced the claims of the Barge Cafe Creditors and Moss and authorized them to

be paid upon the sale of the Lots.  (1044 Proceeding, Doc. No. 116.)

### G.    Chapter 7 Professional Employment and Fee Applications

On August 17, 2017, the Trustee filed an *ex parte* motion to substitute Farinash & Stofan

for Farinash & Hayduk as counsel for the Chapter 7 Trustee.  (Doc. No. 417.)  He alleged that

the substitution was "merely an administrative change" in the law firm in which the Trustee was

a member. The motion was served on the U.S. Trustee and was accompanied by a Declaration of

the Trustee.  (Doc. No. 418.)  No objections were filed, and the Court entered the order

approving the substitution on August 18, 2017.  (Doc. No. 419.)

### 1.    *Trustee's Applications for Himself and His Firm*

On February 12, 2018, two days after the report of sale was filed for the Lots, the Trustee

filed an application for interim compensation as the Chapter 7 Trustee in the amount of

$172,955.79.  (Doc. No. 447 at 2.)

On February 13, 2018, the Trustee filed an interim application for compensation for his

firm's services as counsel for the period from June 22, 2015, to January 18, 2018, for $52,425 in

fees and $2,965.15 in expenses.  All these services were provided while the case was a Chapter 7

case.  (Doc. No. 449.)  The application does not reference the date of the authorization of  the

firm's employment to assist as counsel to the Chapter 7 Trustee. The Court can only presume

that the firm relied on the order entered while the case was a chapter 11, but which reflected that

the case was a Chapter 7.  (*See* Order Granting Application to Employ Jerrold D. Farinash as

counsel for the Trustee, Doc. No. 228.)  Also, the firm obtained an order approving the firm,

---

[7] This issue is on appeal to the District Court in Case No. 1:22-cv-00193-DCLC-CHS (E.D. Tenn.).

albeit in the context of a name change on August 18, 2017, and that order has become final.  On

March 12, 2018, both applications were granted without objection.  (Doc. No. 419).

2.  *Fitch Chapter 7 Applications*

On March 28, 2018, Mr. Fitch filed a second application for compensation, covering

services rendered from June 21, 2016 to March 22, 2018.  (Doc. No. 458.)  All services were

provided during the Chapter 7.  Mr. Fitch sought fees of $25,925 and expenses of $98.25. On

April 20, 2018, the Court authorized the compensation.  (Doc. No. 462.)  On March 19, 2019,

Mr. Fitch filed a third application for fees for the period of March 23, 2018, to March 14, 2019.

(Doc. No. 471.)  He requested fees of $8,675 and expenses of $160.95.  The payment of the third

application was authorized by order entered on April 11, 2019.  (Doc. No. 473.)  On February

28, 2020, Mr. Fitch filed his fourth application for fees for the period March 15, 2019, to

February 5, 2020.  (Doc. No. 481.)  He requested fees of $3,250 and expenses of $75.35.  The

Court granted the application on March 23, 2020.  (Doc. No. 483.)  On January 21, 2021, Mr.

Fitch filed his fifth application for compensation for the period of February 6, 2020, to January

13, 2021.  (Doc. No. 507.)  He requested fees of $3,300 and expenses of $70.85.  Mr. Henry

objected to this application on the basis that these fees should not be paid unless the $300,000

carveout still provided the source of the funds.  (Doc. No. 509.)  The Trustee and Mr. Henry

entered an agreed order that withdrew the objection, based on the determination that there were

still sufficient funds remaining from the carveout.  (Doc. No. 514.)

3.  *Mediation Expenses*

The Trustee and Mr. Henry attempted to resolve Adversary Proceeding 1:18-ap-1044-

SDR through mediation in July and August 2020.  On September 9, 2020, the Trustee filed a

motion to approve payment of the costs of the mediator.  (Doc. No. 486.)  The costs were

12

incurred by Hull, Ray, Rieder, Ewel, Lane & Lynch in the amount of $2,312.50 and $1,062.40 for two mediation sessions.  The Court granted the payment of the mediator's fees and expenses on October 23, 2020.  (Doc. No. 500.)

4.  *Hatcher Chapter 7 Expenses*

On May 5, 2016, the Trustee sought the assistance of B. Paul Hatcher as special counsel for the Trustee to assist with issues related to the real property, title, and escrow issues, and possibly to be an expert witness with respect to liens and charges on the property of the estate. (Doc. No. 323.)  The Court authorized the appointment on May 31, 2016.  (Doc. No. 333.) On June 1, 2018, Mr. Hatcher applied for compensation as Special Counsel for the period May 19, 2016, to January 18, 2018.  (Doc. No. 465.)  He sought fees of $4,110.  The services were performed entirely during the Chapter 7 phase.  The Court authorized the payment of the services on June 26, 2018.  (Doc. No. 467.)

5.  *Employment of Andrea Hayduk and Best Hayduk Brock, PLLC*

Ms. Hayduk left the Trustee's firm.  On May 2, 2019, the Trustee sought to employ her and her new firm as counsel for the Chapter 7 Trustee.  (Doc. No. 475.)  The Court authorized her employment on May 6, 2019.  (Doc. No. 477.)

6.  *The Trustee's Current Application for Compensation*

The Court now reaches the current fee application filed by the firm of Farinash & Stofan on May 19, 2022 for $71,313.75 in fees and $2,032.96 in expenses.  (Doc. No. 520.)  The application covers the period February 13, 2018, through and including May 4, 2022.  The services itemized were provided by the Trustee, Amanda Stofan, and Rebecca Farinash.  There are no entries for Ms. Hayduk.  All the services were rendered for the Chapter 7 Trustee during this period.  The work includes the post-sale matters and the resolution of claims.

Early in this period, the Trustee became aware that Mr. Henry was seeking to collect his claim for his legal services against the Casey Creditors in state court.  The Casey Creditors removed Mr. Henry's state court suit to this Court (Adversary Proceeding 1:18-ap-1029-SDR, the "1029 Proceeding"), and the Trustee intervened. That action prompted the Trustee to bring an adversary proceeding (Adversary Proceeding 1:18-ap-1044-SDR, the "1044 Proceeding") objecting to Mr. Henry's claim and seeking subordination of that claim and contempt damages for Mr. Henry's attempts to collect on that claim against the Casey Creditors.  This adversary proceeding also included an objection to the amount of Mr. Henry's claim.

Mr. Henry objects to all of the fees that the Trustee has claimed for his work on these two adversary proceedings.

### a.  The 1029 Proceeding

Mr. Henry contends that $27,498.75 of the fees requested in the current application relate to the Trustee's intervention in this adversary proceeding which was originally instituted only against the Casey Creditors to recover Mr. Henry's legal fees. The Trustee does not dispute the calculation of the amount involved.

### b.  The 1044 Proceeding

Mr. Henry objects to all the fees that the Trustee seeks in connection with the 1044 Proceeding.  Mr. Henry argues that what little the Trustee gained for the estate in this adversary proceeding currently is under appeal; at a minimum, the Trustee should be paid only for part of his work in this proceeding and only if he prevails on appeal:

> Applicant requests approximately $42,667.50 in fees in association with this adversary proceeding.  From the review of adversary, it appears that the Applicant has done little if anything to benefit the estate at this time and that $42,667.50 is excessive when the Trustee has very little to show from it.  Count 1 of the adversary proceeding was dismissed on summary judgment.  Summary judgment as to Count 3 was provisionally granted subject to the Court's review of the Trustee's Supplemental Memorandum.  The Court did not grant summary

14

judgment as to Count 2; however, it is questionable as to whether the Applicant's work will actually benefit the estate if the Trustee prevails on that issue.

> The Trustee and the Applicant did prevail on the Trustee's motion for summary judgment in which the Court ruled that Henry's lien was unsecured because there was not sufficient money to pay him. The Court should disallow any fees to the Applicant until the conclusion of this litigation so that it can be determined what benefit, if any, the Trustee's action and the Applicant's work have really benefited the estate.

(Doc. No. 522 at 24.)  Mr. Henry also objects to a January 24, 2019 billing entry for $255 that was listed twice.  The Trustee does not oppose a reduction for the duplication.

The 1044 Proceeding includes a claim for violation of the automatic stay and an objection to Mr. Henry's claim.  The claim for violation of the stay has survived Mr. Henry's motion for summary judgment, and the objection to Mr. Henry's claim related to ambiguities in billing entries has survived a motion for summary judgment as well.  If the Trustee succeeds, then those billing entries will have significant impact on the claim.  In addition, the Trustee successfully has challenged the interest rate that Mr. Henry could charge, reducing the claim and thereby benefiting the estate.

### H.    Adversary Proceeding 1:19-ap-01037-SDR

The Trustee brought a third adversary against Mr. Henry, relying on an assignment of the claims of another group of creditors with whom the Trustee settled.  The Trustee seeks no compensation for this adversary proceeding, which was ultimately dismissed.

## III.    DISCUSSION

### A.    Interim Compensation Generally

Under the Bankruptcy Code, courts may award reasonable compensation to a professional person employed under Section 327 for actual, necessary services rendered.  11 U.S.C. § 330(a)(1)(A) and (B).  *See also Silverman & Morris, P.L.L.C. (In re Village Apothecary, Inc.)*, 45 F.4th 940 (6th Cir. 2022) (citing 11 U.S.C. § 330(a)).  Prior to the

15

completion of the case the Court may award interim compensation under 11 U.S.C. § 331.
Interim compensation is allowed by the bankruptcy court after notice and a hearing "as is
provided under section 330 of this title."

The applicant is a professional person employed by the Trustee with the Court's
approval. 11 U.S.C. § 327(a). Although the exact date of the approval is in question. The order
entered on March 30, 2015, referencing Chapter 7, was entered before the Trustee was
authorized as the Chapter 7 Trustee to employ anyone. The Court did enter an order on August
18, 2017 that acknowledged his firm's engagement as his counsel and substituted the new name
of his firm. (Doc. No. 419.) Fees covering this period were applied for and authorized to be
paid on March 12, 2018 without objection or challenge. As a result of the August 18, 2017
order, the Court finds that the employment of the firm of Farinash & Stofan has been authorized
by the Court for the period when the services in this application were provided.

Once the Court confirms that the professional person is authorized to be employed, the
Court's inquiry as to the reasonableness of the compensation begins by employing the lodestar
method. *Silverman*, 45 F.4th at 947. The lodestar method was adopted by the Sixth Circuit in *In
re Boddy*, 950 F2d 334, 337 (6th Cir. 1991) and its applicability to bankruptcy fee request
evaluations was recently reaffirmed in *Silverman*. *Silverman*, 45 F.4th at 944. The Court must
first look at the reasonableness of the hourly rate and then the reasonableness of the hours spent.
If that test is met, then the bankruptcy court may exercise its discretion and vary the award based
on all relevant factors. Prior to 1994, courts might look to *Johnson v. Ga. Highway Express,
Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489
U.S. 87 (1989), for an enumeration of factors to consider. The *Johnson* case listed 12 factors, the

16

majority of which were incorporated into section 330 when it was amended in 1994 by the

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 224m 108 Stat. 416, 4130-31.

Section 330(a)(3) requires the Court to consider "the nature, the extent, and the value of

such services, taking into account all relevant factors" including the following six factors:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at
the time at which the service was rendered toward the completion of, a
case under this title;

(D) whether the services were performed within a reasonable amount of time
commensurate with the complexity, importance, and nature of the
problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or
otherwise has demonstrated skill and experience in the bankruptcy field;
and

(F) whether the compensation is reasonable based on the customary compensation
charged by comparably skilled practitioners in cases other than cases
under this title.

11 U.S.C. § 330(a)(3). The Sixth Circuit clarified in *Silverman* that section 330(a)(3) is not an

exhaustive list. Bankruptcy courts may still consider all relevant factors that were not codified.

*Silverman*, 45 F.4th at 949. One of those factors may be success. Section 330(a)(4) requires the

Court to disallow any requested compensation for unnecessary duplication of services; or for

services that were not reasonably likely to benefit the estate or not necessary to the

administration of the case. *Id.* § 330(a)(4)(A).

> ### B.    Is the Applicant's Requested Compensation Reasonable?

After reviewing the rates and hours expended in this case, the Court finds that both are

reasonable. The rate for the Trustee is $425 an hour. He is a very experienced bankruptcy

attorney with a considerable history representing trustees. The rate is commensurate with other

rates the Court has approved for attorneys of his experience level.  According to his application, he expended 110.75 hours during a period that extends from February 13, 2018, shortly after he sold the Lots, through the filing and pursuit of the adversary proceedings to May 4, 2022, a four-year period.

His colleague Ms. Stofan spent 3.7 hours, which were billed at $325. Mrs. Stofan has practiced bankruptcy law for over ten years and the Court finds the rate and time reasonable given her experience and limited involvement during this period. His associate Rebecca Farinash joined his firm in 2017, charged $175 an hour, and provided 129.1 hours for her services. She is a recent law school graduate. Her services included activities that are customary for an associate to perform such as research and drafting and do not appear to be duplicative of Mr. Farinash's or Ms. Stofan's services.

As noted from the history and fee requests by several professionals, this has been a complex case involving numerous creditors and public interests as a result of the barge removal. The Trustee negotiated a significant settlement and successful sale.  With respect to the adversary proceedings, the time expended reflects Mr. Henry's diligent pursuit of his claims.  In the 1029 Proceeding, he has filed four amended complaints; opposed intervention; and sought dismissal, abstention, and a motion for summary judgment on the Trustee's counterclaim.  With respect to intervention, he also filed a motion to reconsider.  The Court also finds the Trustee's services rendered in response to these actions were performed within a reasonable amount of time given the complexity, importance, and nature of the issues and tasks.

**C.    Were the services likely to benefit the estate and necessary for administration of the estate?**

The focus of Mr. Henry's objection is the time related to the remaining factor.  He challenges whether pursuing the adversary proceedings was likely to benefit the estate,

18

particularly the intervention and counterclaim filed in the 1029 Proceeding.  Mr. Henry contends

that the Trustee did not need to intervene and that he "chose to insert himself into this adversary

proceeding for the sole purpose of filing a counterclaim against Henry for an alleged implied

partnership between the Debtor and Henry." (Doc. No. 552 at 5.)  That counterclaim eventually

was dismissed on a motion for summary judgment on February 9, 2021.  Mr. Henry also argues

that the intervention was not reasonably likely to benefit the estate.  On this basis, Mr. Henry

contends that $27,498.75 is attributable to these services and should be disallowed.

The Court disagrees that the time spent on intervention in the removed action was not

calculated to benefit the estate. The Court has discussed the Trustee's interest in protecting his

settlement and sale order in a prior oral opinion allowing the intervention (1029 Proceeding,

Doc. No. 52), and written opinions denying Mr. Henry's motion to reconsider (1029 Proceeding,

Doc. Nos. 78, 79), and denying Mr. Henry's motion to remand (1029 Proceeding, Doc. No. 85).

The Court incorporates the conclusions made in the prior opinions as its basis for finding that the

Trustee's action was necessary and appeared to be beneficial to the estate when the service was

provided.

The Court finds the Trustee's reason for intervening was to protect the benefits to the

estate of the sale and settlement.  As stated in the Court's decision to grant the Trustee's motion

to intervene,

> [t]he plaintiff [Henry] is still seeking to have a court equitably create property
> interests in favor of Mr. Casey from Mrs. Casey's assets upon which the plaintiff
> can execute.  The basis for the exercise of these equitable remedies is grounded in
> pre-settlement claims that implicate the court's settlement and sale orders.  To the
> extent that the plaintiff asserts those claims, the trustee has a significant legal
> interest entitling him to intervene.

(1029 Proceeding, Doc. No. 78 at 10.)

19

Mr. Henry's objection to the firm's time spent pursuing an implied partnership theory in the counterclaim against Mr. Henry in the 1029 Proceeding deserves closer scrutiny. The Trustee claimed that Mr. Henry was a partner with Mr. Casey and was liable for half of the estate's debts. The complaint was similar to Mr. Henry's claims in the 1029 Proceeding against the Casey Creditors. The basis for this counterclaim did not rest on any contract or testimony that a partnership existed or any admission by Mr. Henry that he had an expectation of profit beyond repayment of a note with interest for legal services, even though the payment was long overdue. Emma Casey never asserted implied partnership as a defense in her answer. The Court granted Mr. Henry's motion for summary judgment on this issue and dismissed the counterclaim. In reviewing the fee application, the firm provided services in the amount of $3,510 related to the preparation of this counterclaim and the response to the motion for partial summary judgment.[8] The Court will disallow the fees related to the counterclaim.

With respect to the 1044 Proceeding, the Court recognizes that there is an overlap with the 1029 Proceeding with respect to the claim of violation of the stay and the claim of violation of the court order. This overlap does not in and of itself lead the Court to conclude that these services are duplicative. At the time the 1044 Proceeding was filed, Mr. Henry was fighting the Trustee's intervention. Had the Court's decision gone in Mr. Henry's favor and the Trustee had not been allowed to intervene, the 1044 Proceeding ensured that the Trustee would have a forum

---

[8] In reviewing the entries to which Henry objected that were noted in his objection (Doc. No. 522), the Court included the following entries in its calculation:

| Date | Time |
|------|------|
| 9/25/2018 | 0.65 |
| 9/26/2018 | 1.40 |
| 7/11/2019 | 0.85 |
| 11/18/2020 | 1.6 |
| 11/19/2020 | 2.6 |
| 11/20/2020 | 0.7 |
| Total | 7.8 hours, $3,510. |

Where time was spent on the answer and counter complaint, the Court included 50% of the time.

to bring his own causes of action for the potential damage to the settlement and sale.  Since the

Court resolved the intervention issue, the Trustee has consistently agreed to consolidate the

issues.  As for benefit to the estate, of the three causes of action that the Trustee alleged, two

have survived a motion for summary judgment.  The objection to Mr. Henry's claim has already

resulted in a reduction of the amount attributable to interest.  The Court finds that the services

were necessary and were not duplicative under the circumstances.

Mr. Henry's objection requires the Court to address one additional factor that is raised in

the assessment of whether services were necessary or beneficial to the estate—success:

> Although each factor set forth in 11 U.S.C. § 330(a)(1) is independent,
> each is also related to the others.  Because benefit to the estate (or success of the
> endeavors) is always a primary focus of the analysis, the relationship between the
> factors need not be positively correlated.  In some cases impressive results may be
> obtained with little effort and should be awarded generously.  However, great
> amounts of time and energy with little result require much greater scrutiny.  The
> focus must be on the result achieved and the benefit obtained for the estate.

*In re Cardinal Indus., Inc.*, 151 B.R. 843, 847 (Bankr. S.D. Ohio 1993) (citations omitted).  Any

analysis of likely success of the Trustee's efforts should be contemporaneous and not

retrospective:

> When evaluating the benefit to the estate, courts objectively consider
> whether the services rendered were reasonably likely to benefit the estate from the
> perspective of the time when such services were rendered.  The pertinent question
> is not whether the services performed by the professional conferred an actual
> benefit upon the estate; but whether, when viewed under the circumstances in
> existence at the time, the services were reasonably calculated to benefit the estate.
> In making this determination, however, a court should resist the temptation to
> engage in "20/20 hindsight," and focus instead on facts known (or which should
> have been known) to the applicant at critical points during the pendency of the
> case.

*In re McLean Wine Co., Inc.*, 463 B.R. 838, 848 (Bankr. E.D. Mich. 2011) (internal quotation

and editorial marks and citations omitted).  This is an interim application, and in light of the

Trustee's interest in preserving the benefits of the sale and settlement for the estate and his

success reducing Mr. Henry's claim, the Court finds the Trustee has met his burden on the issue

of success sufficiently to overrule Mr. Henry's objection.

The Court will disallow $3,510.00 attributable to services provided related to the 1029

Proceeding and $255 for a billing duplication. Other than the pursuit of the implied partnership

counterclaim, the Court finds that the other services with a value of $67,548.75 were necessary

for the administration of the estate and were likely to benefit the estate at the time the services

were rendered. The Court will allow all expenses in the amount of $2,032.96.

### D.    Are there funds available for payment?

To the extent that the Court has authorized interim fees in the amount of $67,548.75 and

expenses of $2,032.96, Mr. Henry also objects to the use of any fees in excess of the amount of

the Settlement Carve Out until there is a final order regarding this Court's ruling that Mr.

Henry's claim is a general unsecured claim as a result of the preservation of the Casey Creditors'

lien for the benefit of the estate. If the Court's decision is affirmed, then the allowed Trustee's

fees would have priority over Mr. Henry's unsecured claim. If Mr. Henry's appeal is successful,

his lien attaches to the sale proceeds and any payment of fees in excess of the $300,000 carve out

could be subject to disgorgement depending on the amount of Mr. Henry's allowed claim.

The sale motion provided that there would be a subordination of $300,000 to pay, first,

"all Chapter 7 administrative fees, in full," then to other purported lien holders except Mr.

Henry. (Doc. No. 425 at 3.) Based on the Court's analysis, the following Chapter 7 expenses

have been paid to the Trustee and his professionals from the subordinated $300,000:

| Payee | Fees Paid | Expenses | Total |
|-------|-----------|----------|-------|
| Farinash, as Chapter 7 Trustee | $172,955.79 | | |
| Farinash & Stofan | $52,425.00 | $2,965.00 | |

22

| | | | |
|---|---|---|---|
| Roger Fitch, accountant | $17,750.00 | $534.10[9] | |
| Second application | $25,925.00 | $98.25 | |
| Third application | $8,675.00 | $160.95 | |
| Fourth application | $3,250.00 | $75.35 | |
| Fifth application | $3,300.00 | $70.85 | |
| Paul Hatcher, special counsel | $4,110.00 | | |
| Total Chapter 7 Administrative Fees Paid | $288,392.54 | $3,904.50 | $292,297.04 |
| "Carve out" remaining | | | $7,702.96 |

The Court notes that the sale order used the term "fees" and not "expenses," the term used in 11

U.S.C. § 503(b).  The Court is not making a finding of fact as to whether the Trustee's

commission would fall within the definition of a fee or whether the fees paid to the mediator

should have been included in the calculation.  That may be an issue for the final fee application,

but at this time, the carve out may be close to being exhausted.  There also remains an issue of

whether the payments to Neuhof Architecture and Xylem Dewatering should be included.  The

Court also notes that some Chapter 11 expenses have been paid in full while others, like the

debtor's attorney, have not been paid at all.  That issue will need to be addressed.  *See, e.g.,*

*Specker Motor Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2004); *but see In re Home Loan Serv.*

*Corp.*, 533 B.R. 302 (Bankr. N.D. Cal. 2015).

Although Mr. Henry has made the request, he has not sought a stay of the Court's order

entered on March 31, 2022.  As the case stands, the remaining funds in the estate would be

available to the pay administrative expense claims.  However, the Court is growing concerned

---

[9] The Court allocated the fees for services provided on the date of conversion and thereafter to Chapter 7 fees.

about the administrative solvency of this case and the prospects of disgorgement.  For these reasons, the Court will require a holdback of 20% of the allowed fees until a final application is filed and approved.  Therefore, the Trustee is authorized to pay 80% of the allowed amount of fees and 100% of expenses to the firm of Farinash & Stofan.

## IV.    CONCLUSION

The Court finds that the fees and expenses requested by Farinash & Stofan are reasonable and meet the requirements of section 330 (a)(3) and (a)(4) of the Bankruptcy Code except for fees in the amount of $3,510.00 related to the counterclaim against Mr. Henry filed in the 1029 Proceeding and $255 for a duplicate billing.  Accordingly, fees are allowed in the amount of $67,548.75 and expenses are allowed in the amount of $2,032.96.  However, due to concerns regarding the administrative solvency of the case, the Court is limiting the payment of the interim fees to 80% of the allowed amount and 100% of the expenses.  The Trustee may pay $54,039.00 in fees and $2,032.96 in expenses.  Payment of the remaining allowed fees may only be paid upon further order of the Court.

A separate order will follow.

# # #